**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

CRAIG AIR CENTER, INC. and
SKY HARBOR CORPORATION,

                Plaintiffs,

vs.                                        Case No. 3:10-cv-48-J-32TEM

CITY OF JACKSONVILLE,

                Defendant.

_____

## ORDER

      Plaintiffs, two fixed-base private operators at Craig Municipal Airport, seek a declaration that a provision of the City of Jacksonville's comprehensive land use plan which restricts the length of runways at Craig Municipal Airport is preempted by federal law. Plaintiffs claim this restriction harms their business interests because, if the runway were longer, they could run more profitable operations at Craig Airport.  However, the Court's ability to redress plaintiffs' alleged injury depends on the actions of a third party, the Jacksonville Aviation Authority (the "JAA"), because only the JAA has the authority to extend the runway. On these facts, where plaintiffs have not shown that it is "likely" that the JAA would act to extend the runway if the Court were to grant relief, plaintiffs have not presented the Court with a live case or controversy.

      This case is before the Court on the parties' cross motions for summary judgment. (Docs. 30, 36.)[1]  The Court held a hearing on the pending motions on July 25, 2011, the

_____

[1] An amicus curiae brief was also filed by several homeowners in support of the City's cross-motion for summary judgment. (Doc. 33.)

transcript of which is incorporated by reference. (Doc. 43.) At the hearing, the Court invited the parties to file supplemental briefing.  After plaintiffs filed a supplemental memorandum (Doc. 46),[2] the Court deferred ruling on the parties' cross-motions, allowed further discovery, and directed the parties to file further supplemental briefing (Doc. 48).  All briefing is now complete. (Docs. 55-56.)  The Court held another hearing on July 16, 2012, the record of which is incorporated by reference.  (Doc. 60.)

## I.   BACKGROUND

Craig Airport is a federally funded airport that is designated as a Reliever Airport for Northeast Florida.  (Doc. 24 at 4-5.)[3]  The Jacksonville Aviation Authority (the "JAA"), an independent agency of the City of Jacksonville, owns and operates four airports in the Jacksonville area, including Craig Airport.  (Id. at 3-4.)[4]  Plaintiffs Craig Air Center, Inc. ("Craig Air") and Sky Harbor Corporation ("Sky Harbor") are fixed-base operators at Craig Airport that provide hanger, tie-down, fueling, and charter services to aircraft.  (Doc. 24 at 5.)  The primary runway at Craig Airport is approximately 4,000 feet in length,  (id. at 6.), and the JAA has exclusive authority to develop and make improvements to the runway.  (Doc. 36 at 7-10.)

_____

[2] The City declined to file supplemental briefing at that time.  (Doc. 45.)

[3] "A Reliever Airport is an airport designated to relieve congestion at a commercial service airport and to provide more general aviation access to the overall community."  (Doc. 24 at 5.)  "Florida has twenty-two Reliever Airports," nine of which, like Craig Airport, have a runway of approximately 4,000 feet or less. (Id.)

[4] The JAA also operates Jacksonville International Airport, the region's primary airport. (Id.)

In 2008, the JAA, in cooperation with the Federal Aviation Administration and the Florida Department of Transportation ("FDOT"), created a new Master Plan for Craig Airport. (Id.)  The Master Plan included a provision for the extension of the runway to a length of approximately 5,600 feet.  (Id.)  The extension was to be within the boundaries of Craig Airport on property owned by the JAA.  (Id.)  However, the City's Comprehensive Land Use Plan ("Comp Plan") prohibits any extension of the runway beyond its current length.  (Id. at 7.)[5]  In August 2007, the JAA proposed an amendment to the Comp Plan that would have authorized the runway extension. (Doc. 36 at 10).  The City Council ultimately adopted a resolution to approve the amendment, including the 5,600 foot runway, but only after adding certain conditions.[6]  This resolution was then transferred to state agencies for review and comment.

The FDOT commented on the proposed amendment in a letter dated February 20, 2008.  (Doc. 36-15.)  The letter states that "the trips associated with the proposed Runway Extension may impact the State Roads in the area.  The Department is concerned with the capacity of the State roads . . . , and any additional traffic on the system will further degrade the segments already operating at unacceptable [levels of service]." (Doc. 36-15 at 11.)  The

---

[5] Specifically, the Comp Plan states: "The City shall continue to support the maintenance of Craig Airport in its current role as a General Reliever Airport; provided, however, that no further expansion of its runways shall be permitted."  (Doc. 24-13 at 3.)

[6] Among other things, the amendment was altered to limit the length of the runway to 5,600 feet (the same length proposed under the Master Plan) and prohibit any thickening of the runway. The amendment also prohibited fixed-base operators (such as plaintiffs) from operating during the period of midnight to 4:00 a.m. Moreover, the amendment required the JAA to place certain property at Craig Airport into a conservation easement.  (Doc. 36-13 at 4.)

FDOT ultimately concluded:

> The proposed extension of Runway 14-32 at Craig Municipal Airport is consistent with the Florida Aviation System Plan, however, a number of the specific restrictions sought to be placed on the airport in conjunction with the runway extension create potential inconsistencies with the Federal and State grant assurances and the Florida Aviation System Plan. This could potentially jeopardize present and future funding for the airport. Staff would recommend the City not adopt [the proposal.] Alternatively, the City may choose to adopt the policies with changes . . . .

(Doc. 36-15 at 14.)[7]

The JAA withdrew the Comp Plan amendment on April 1, 2008, shortly before the City Council Committee on Land and Zoning was scheduled to discuss it.  (Docs. 36 at 10-11; 36-16 at 2; 36-17 at 2-5.)  In a press release, the JAA stated that it had withdrawn the amendment out of concern that the conditions added by the City Council could have violated the terms of the airport's deed and certain FAA restrictions.  (Doc. 40 at 46.)

In an April 16, 2008, letter addressed to the President of the City Council, the then Executive Director and CEO of the JAA thanked the President for allowing the JAA to withdraw the proposed amendment, recognized that runway expansion "has been a highly

---

[7] The FDOT expressed concern regarding several of the restrictions placed on the JAA in the City's proposed amendment to the Comp Plan.  First, the FDOT was concerned with the restrictions on future runway extensions, any thickening of the runway, and construction of any new runways.  (Doc. 36-15 at 13.)  The FDOT explained that, while an extension of the runway would have allowed heavier aircraft to operate at Craig Airport, FAA advisories would have required a strengthening of the runway if such aircraft annually landed at Craig Airport on more than 500 occasions.  Second, the FDOT noted that the amendment's prohibition on operations between the hours of midnight to 4:00 A.M. would be "in violation of FAA policy as well as FDOT grant assurances."  (Id. at 14.)

contested issue,"[8] and outlined the steps the JAA intended to take going forward.  (Doc. 36, ex. O.)  The letter states that the JAA planned to: submit the Master Plan to the FAA for approval; meet with the community to share the contents of the Master Plan; submit the Master Plan to the JAA Board; and engage a firm to complete an Environmental Assessment. (Id.)[9]

On March 22, 2009, the JAA received approval of the Master Plan from the FDOT; however, the FDOT refused to participate in funding the runway extension because of its inconsistency with the City's Comp Plan.  (Doc. 40 at 42.)  The JAA also received preliminary approval of the Master Plan from the FAA on May 6, 2009, subject to the completion of feasibility and environmental studies and the FAA's final approval.  (Doc. 40 at 43-44.)  The FAA stated that its preliminary approval meant that the Master Plan met current FAA requirements and was "useful and efficient."  However, the FAA also stated that preliminary approval did not imply that the FAA would fund the runway extension or that such work was justified. (Id.)

Although it received preliminary approvals from the FDOT and the FAA in 2009, the JAA itself has made no additional effort to ask the City Council to remove the Comp Plan restriction or otherwise taken any significant steps towards the runway extension since

---

[8] There had long been vocal objections to the runway extension by residents of bordering neighborhoods.  However, according to the attorney representing the residents, the JAA's withdrawal of the Comp Plan amendment came as a surprise to the residents, who had expected that the City Council would vote to allow the runway extension.  (Doc. 60.)

[9] The letter estimates that it would take approximately eighteen months to obtain the Environmental Assessment.  (Id.)

2008.[10]  The JAA has not engaged a firm to conduct an Environmental Assessment, and has not allocated any funds to the runway extension.  (Docs. 24 at 7-8, 55-2 at 58-61.)

With the JAA failing to take action, plaintiffs filed this suit, alleging that the restriction on runway length contained in the City's Comp Plan is preempted by federal aviation law.[11] Plaintiffs seek both declaratory relief and an injunction against any further City interference with the runway extension.  (Doc. 1.)

## II.   JURISDICTION

"Article III of the Constitution limits the federal courts to deciding 'cases' and 'controversies.'" Fla. Wildlife Fed'n, Inc. v. S. Fla. Water Mgmt. Dist., 647 F.3d 1296, 1302 (11th Cir. 2011).  The doctrines of standing and ripeness originate from this requirement and "present the threshold jurisdictional question of whether a court may consider the merits of a dispute."  Elend v. Basham, 471 F.3d 1199, 1205 (11th Cir. 2006).

### A.   Standing

"[F]ederal courts cannot exercise jurisdiction over cases where the parties lack

---

[10] Soon after withdrawing the amendment to the Comp Plan, on July 28, 2008, the Board of the JAA authorized management to continue discussions with the FDOT and FAA regarding the environmental and feasibility studies needed for the runway extension.  (Doc. 55-2 at 26-27.)  At the same time, the Board also approved funding for the feasibility study, though it is unclear how much of these funds were ever actually spent, or if any of the feasibility study was ever completed.  (Id. at 28, 35-36.)

[11] Plaintiffs also assert in their Complaint that the City's Comp Plan restriction violates the Commerce Clause.  (Doc. 1 at 11-13.)  However, plaintiffs have not moved for summary judgment on this claim.

standing." Id.[12] "To establish Article III standing, the [plaintiffs] must show that (1) they have suffered, or imminently will suffer, an injury-in-fact; (2) the injury is fairly traceable to the defendants' conduct; and (3) a favorable judgment is likely to redress the injury." Id. "Each element is an indispensable part of the plaintiff's case and must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." KH Outdoor, L.L.C. v. Clay Cnty, Fla., 482 F.3d 1299, 1303 (11th Cir. 2007)(quotation omitted).[13]

The City contends that plaintiffs have failed to meet each of the constitutional requirements for standing. (Doc. 36 at 15.)  According to the City, plaintiffs lack standing because they have contractually granted to the JAA the sole right to extend the runway and there is insufficient evidence that the JAA would extend the runway even if the Comp Plan restriction were removed. (Id. at 15 - 16, 24-25.)[14]

---

[12] The standing requirement applies with equal force to claims for declaratory relief. See Wendy's Int'l., Inc. v. City of Birmingham, 868 F.2d 433, 435 (11th Cir.1989) ("[T]he Declaratory Judgment Act does not enlarge the jurisdiction of the federal courts but rather is operative only in respect to controversies which are such in the constitutional sense. Thus, the operation of the Declaratory Judgment Act is procedural only.") (quotation omitted).

[13] "Article III standing must be determined as of the time at which the plaintiff's complaint is filed." Focus on the Family v. Pinellas Suncoast Transit Auth., 344 F.3d 1263, 1275 (11th Cir.2003).

[14] The City further argues that, because only the JAA may make modifications and improvements to the runway, plaintiffs must meet the requirements for asserting the rights of a third party to the lawsuit. (Doc. 36 at 19-23.)  Plaintiffs, however, are not asserting claims on behalf of the JAA; instead, they have alleged that their legitimate business interests have been harmed by the Comp Plan restriction. (See Doc. 40 at 6-7.)  This case thus does not involve a claim for third-party standing.

In <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 562 (1992), the Supreme Court held that "when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." The Court explained:

> When . . . a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else, . . . causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction . . . . The existence of one or more of the essential elements of standing depends on the unfettered choices made by independent actors . . . and it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury.

<u>Id.</u> at 562 (citations and quotations omitted).

Therefore, although the Comp Plan directly places restrictions only on the conduct of the JAA, plaintiffs nevertheless may have standing if they can demonstrate that the JAA would choose to extend the runway if the Comp Plan were declared invalid.[15] Whether the standing inquiry is analyzed under the rubric of injury in fact, causation, or redressability,[16] plaintiffs must demonstrate that JAA's extension of the runway is "likely," and not "speculative," "conjectural or hypothetical." <u>KH Outdoor</u>, 482 F.3d at 1303 (quotation

---

[15] Plaintiffs must also demonstrate that the failure of the JAA to extend the runway has caused them injury. Although the City argues that it is difficult to predict whether plaintiffs' business would improve at Craig Airport if the runway were extended (Doc. 36 at 15), the Court will assume without deciding that it would. (<u>See</u> Docs. 30-4, 30-5, 40.)

[16] The issue of whether the JAA would complete the runway extension could be seen as relevant to each of the prongs of the standing test. If the JAA has no intention to pursue the runway extension, plaintiffs have suffered no harm as a result of Comp Plan and an Order from this Court would not help them achieve their goal of extending the runway.

omitted); <u>Elend</u>, 471 F.3d at 1207; <u>Tenn. Valley Auth. v. U.S. E.P.A.</u>, 278 F.3d 1184, 1207 (11th Cir. 2002) (partially withdrawn on other grounds).

In their motion for summary judgment, plaintiffs rely in large part on the Joint Stipulated Statement (<u>see</u> Doc. 40 at 9), which provides that the JAA "has planned" to extend the runway and that the Comp Plan "restricts the ability of the JAA" to proceed with construction. (Doc. 24 at ¶ 39-40.) The Joint Stipulated Statement, however, does not state whether the JAA *currently* plans to extend the runway, whether the JAA has made a final decision to extend the runway (as opposed to merely considering the option), or whether any other factor may be blocking construction.[17]

At the July 25, 2011 hearing, plaintiffs also argued that the Master Plan represents a binding "commitment to the Federal Aviation Authority . . . to do the plan and go forward with the runway." (Doc. 43 at 29-32, 40.) They thus claimed that to find the JAA's actions to be speculative would be "to assume that the JAA is not going to act in good faith." (<u>Id.</u> at 31.) Plaintiffs, however, have not cited any support for their argument, and Steven Grossman, the CEO of the JAA, denies that the Master Plan represents any such commitment. (Doc. 55-1 at 13.) Moreover, nothing in the Master Plan indicates that it represents a binding commitment on behalf of the JAA. (<u>See</u> Master Plan, § 1-1) (stating that the Master Plan is "designed to provide the Jacksonville Aviation Authority . . . with long-term guidance . . . over the twenty-year planning period").

---

[17] Plaintiffs also point out that the FDOT has approved the runway extension and that the FAA has granted its conditional approval; however, this evidence provides little indication of JAA's intentions going forward.

Plaintiffs next contend that, because the Master Plan contains specific details regarding how and when the project would be completed, the Court needs no further assurance that the JAA would proceed if this Court were to declare the Comp Plan invalid. (Doc. 43 at 41-43.)  Plaintiffs, however, have cited no case that is factually on point.[18]  The two cases relied on by plaintiffs—Alabama Power Co. v. United States Department of Energy, 307 F.3d 1300 (11th Cir. 2002), and Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252 (1977)—are readily distinguishable.

The dispute in Alabama Power arose from the Department of Energy's (the "DOE") use of money placed in the congressionally-mandated Nuclear Waste Fund (the "Fund"). Under the Nuclear Waste Policy Act, operators of nuclear power plants were required to deposit certain amounts into the Fund to pay for the disposal of nuclear waste.  The Act specified that contributions from the operators should pay the full cost of waste disposal and that the DOE should adjust the required contributions to insure that all costs were fully offset. However, when the DOE was unable to timely construct a waste storage site, it attempted to enter into settlements with nuclear plant operators whereby required contributions to the Fund would be reduced if the operator would give up any contract claims against the DOE. After the DOE reached such a settlement with Exelon, other energy firms challenged the implementation of the settlement by arguing that it was an unauthorized use of Fund monies. Alabama Power, 307 F.3d at 1302-06.

_____

[18] While the parties have cited a number of cases involving challenges to restrictions placed on construction at an airport, each of these cases involved a suit brought directly by the relevant municipality or airport authority.

10

The court in <u>Alabama Power</u> held that the plaintiffs had standing largely because of the "zero-sum nature of the Fund." <u>Id.</u> at 1309.  The court explained that, because contributions to the Fund must equal the cost of waste disposal, "[t]he net effect of the settlement is that the petitioners will have to pay more fees into the [Fund] to compensate for the allegedly unauthorized expenditures that the Department has given Exelon." <u>Id.</u> The Court thus held that the settlement would cause imminent injury that could be redressed by precluding the DOE from spending Fund monies pursuant to the settlement.  The Court also found it significant that, if the plaintiffs were forced to wait until their mandatory contributions to the Fund were increased, it may have been impossible for plaintiffs to prove that any such increase was due to the settlement.  <u>Id.</u> The Court thus found that the settlement would cause an imminent injury and that action from the Court was likely the only possible way to redress such injury. <u>Id.</u> at 1309-10.

Here, there is no such imminent injury that could be redressed by an order from the Court.  In <u>Alabama Power</u>, given the "zero-sum nature" of the Fund, it was clear that the challenged action would require the plaintiffs to pay more into the Fund than they otherwise would have paid.  In this case, however, it is not clear whether the City's Comp Plan actually causes any injury to plaintiffs because it is uncertain whether, in the absence of the Comp Plan, the JAA would actually proceed with its plans to extend the runway.  Because there was no independent third party in <u>Alabama Power</u> who could break the causal chain between the Court's order and relief to the plaintiffs, such uncertainty was not at issue.

The Supreme Court's decision in <u>Village of Arlington Heights</u> was also rendered under very different circumstances.  In <u>Village of Arlington Heights</u>, a non-profit developer

11

contracted with a religious order to buy land for the development of low and moderate income housing on the condition that the developer could obtain financing and zoning approval.  After the developer created detailed plans for the project, the village denied its request to zone the proposed land for multiple-family housing.  The developer then filed suit against the village, claiming that the zoning decision was motivated by racial discrimination. Village of Arlington Heights, 429 U.S. at 254-60.

The Supreme Court held that the developer had standing to bring suit. The Court noted that, even if the zoning decision were declared unconstitutional, there was no guarantee that the project would be completed because the developer "would still have to secure financing, qualify for federal subsidies, and carry through with construction." Id. at 261.  However, the Court ultimately held that, given the detailed plans already prepared by the developer and the nature of the uncertainties at issue, which were common to all construction projects, the developer had demonstrated an injury that was "likely to be redressed by a favorable decision." Id. at 262 (quotation omitted).

The uncertainties present here are different in kind from those at issue in Village of Arlington Heights.  In that case, an experienced private developer had already obtained a contract for the purchase of land for a construction project, and the Court merely noted it was theoretically possible that problems could have arisen to prevent construction, such as a denial of financing or federal subsidies.  Village of Arlington Heights thus would perhaps be analogous to this case if suit had been brought by the JAA.  Much like in that case, the land on which the runway would be extended is already owned by the JAA, it is uncertain whether the JAA will receive funding from the FAA and the FDOT, and the JAA would also need to

12

carry through with construction.  However, since suit was brought by these private plaintiffs and not the JAA, an additional layer of uncertainty is added.  Not only is there no guarantee that the JAA would be able to obtain funding or complete construction, but it is also unclear whether the JAA even intends to move forward.

In their supplemental briefing, plaintiffs assert that the depositions of Steven Grossman, the CEO of the JAA, and Robert Molle, the JAA's designated Rule 30(b)(6) corporate representative and Director of Planning and Development (taken in 2011 and 2012), demonstrate that "the Runway Project continues to be an important initiative of the JAA, and one that the JAA will pursue if the Comp Plan restriction is declared unconstitutional." (Doc. 55.)  Grossman states that, if the Comp Plan restriction were removed, he would recommend to the Board that the JAA proceed with the environmental and feasibility studies needed to obtain federal financing for the runway project. (Doc. 55-1 at 9, 13.)  He also asserts that he is not aware of anything that would lead him to believe that the runway project would be denied funding by the FAA or FDOT.  (Id. at 16-17.)

However, because Grossman would be unable to unilaterally authorize the project, his testimony indicates the JAA would proceed with the runway project only if it also shows that the Board shares his views.  His testimony on this subject is much more equivocal.  He states that, at the time he was hired as CEO in 2009, "individual Board members indicated . . . that extending the runway at Craig was an important issue for them." (Doc. 55-1 at 8.)[19]

---

[19] When asked if "that" has changed, Grossman answered "no."  (Id. at 8-9.)  While it unclear exactly what Grossman was referring to, the Court presumes he meant that he believes the opinions of these "individual Board members" has not changed.

He further asserts that, "[g]iven the previously stated policies of the Board, I would expect that they would want to proceed" if the Comp Plan restriction were removed.  (Id. at 14.) Finally, he states that he has not been informed that the Board has abandoned the runway project.  (Id. at 19.)

Although Grossman thus believes that the Board would wish to pursue the runway project (largely based on the Board's actions in 2008), he does not speak definitively for the JAA on this issue; instead, Robert Molle was designated as the JAA's corporate representative under Rule 30(b)(6).  Under Rule 30(b)(6), when a party "describe[s] with reasonable particularity the matters for examination," a corporation may designate a person "to testify on its behalf."  Fed. R. Civ. P. 30(b)(6).  The Rule further provides that "[t]]he persons designated *must* testify about information known or reasonably available to the organization."  Fed. R. Civ. Pro. 30(b)(6) (emphasis added).

Here, plaintiffs' corporate deposition notice "describe[d] with reasonable particularity" the critical issue to be discussed at the deposition: whether the JAA would pursue the runway extension if the Court were to remove the Comp Plan restriction.[20]   Rule 30(b)(6) thus required the JAA to designate a witness who could testify on its behalf regarding this subject and adequately prepare its designee to state all information "known or reasonably available to the organization."  See QBE Ins. Corp. v. Jorda Enterprises, Inc., 277 F.R.D.

---

[20] Specifically, the notice includes the following subject areas: "the JAA's current position as to the runway project that is included in its Master Plan or, alternatively, its position as to any extension of the runway or another runway at Craig Airport," and "the effect of the Comp Plan restriction on any plan by the JAA to extend the runway or any other runway at Craig Airport."  (Doc. 55-2 at 12-13.)

676, 688 (S.D. Fla. 2012) (explaining that a corporation "must perform a reasonable inquiry for information that is reasonably available to it").[21]  Molle's testimony regarding JAA's intentions for the runway at Craig Airport thus constitutes the JAA's official statement.[22]

Through Molle, the JAA stated that it does not know whether it currently desires to proceed with the runway extension.  Molle testified that, when Grossman was initially made the CEO in 2009, "the board membership at that time" supported the extension.  (Doc. 55-2 at 42.)  He continued: "What I'm not clear on is since then. . . . I am not aware of the—any—specifically what the board's feelings are, the individual board members in the current board makeup."  (Id.)  He further stated:

> I can speak generally to the fact that when this was going on prior to and when Mr. Grossman first came on board [in 2009] . . . we were intending and wanting to move forward with the runway project.  After he came on board, and some the things

---

[21] A 30(b)(6) witness need not limit his testimony to personal knowledge; instead, he may testify to any matter known to the corporation. Id.  Moreover, Molle testified that he was prepared to testify on behalf of JAA as to each subject identified in plaintiffs' deposition notice. (Doc. 55-2 at 12-13).

[22] Courts have found that, while the testimony of a 30(b)(6) witness is not a judicial admission, it is binding in the sense that it constitutes the official testimony of the corporation. See e.g., R & B Appliance Parts, Inc. v. Amana Co., 258 F.3d 783, 787 (8th Cir.2001); Continental Cas. Co. v. First Fin. Employee Leasing, Inc., 716 F. Supp. 2d 1176, 1190 (M.D. 2010); see also QBE Ins., 277 F.R.D. at 688 ("The testimony of a Rule 30(b)(6) witness represents the collective knowledge of the corporation, not of the specific individual deponents. A Rule 30(b)(6) designee presents the corporation's position on the listed topics. The corporation appears vicariously through its designees.").
At the July 16, 2012 hearing, plaintiffs seemed to dismiss the testimony of the JAA's 30(b)(6) witness because he had not spoken to the Board of the JAA before testifying. Plaintiffs, however, have not moved to strike the deposition, moved to compel the JAA to more adequately prepare its witness, or otherwise challenged the testimony of the JAA's corporate representative.  Under these circumstances, the Court will accept the testimony of the JAA's 30(b)(6) witness.

> that took place after that, *I'm not sure—there hasn't been any concrete direction since then.*

(Id. at 55)(emphasis added).[23]  Molle also testified that he could not "recall anything recently coming up at a Board meeting in connection with the runway extension."  (Id. at 66.)[24]

The JAA's official position, as provided in Molle's deposition, is not inconsistent with Grossman's testimony.  Grossman stated that, in 2009, "individual Board members" told him the runway project was important and that he "expects" the Board still wishes to pursue it.  Viewing this testimony together, it appears that, while certain individual Board members and the CEO may favor the runway project, it is nevertheless unclear whether the JAA as an entity would actively pursue the project in the absence of the Comp Plan restriction.

The JAA's actions since adopting the Master Plan are also consistent with the testimony of its corporate representative.  In April 2008, the JAA had before the City Council a formal request to lift the Comp Plan restriction so that it could extend the runway.  However, the JAA then withdrew the proposed amendment to the Comp Plan.  Since that time, the JAA has taken no formal steps to discuss the matter with City Council or renew its request to amend the Comp Plan.

---

[23] When asked if he had any reason to doubt Grossman's testimony regarding the Board, Molle stated that he had "no firsthand knowledge of that" but that he "had no reason not to believe [Grossman]."  (Id. at 43.)  Molle also testified that the Board had not directly told him that the JAA is no longer interested in pursuing the runway project.  (Id. at 55.)

[24] Regarding the JAA's submission of the Master Plan to the FAA and FDOT, which occurred in 2008 and early 2009, Molle stated: "I would state that what was being authorized was the ability to move forward with certain aspects of the next steps that we all knew would be required if and when we were able to move forward with the runway extension. . . . *We were . . . making sure that we would have the ability to do that if and when we decided to move forward with it, yes.*"  (Doc. 55-2 at 58)(emphasis added).

Moreover, after the JAA withdrew the Comp Plan amendment, the Executive Director and CEO of the JAA wrote to City Council and explained that he intended to recommend a number of steps to the JAA Board before pursuing the matter further with the City.  (Doc. 36, ex. O.)  Several of these steps, however, have not been taken, including engaging a firm to complete an Environmental Assessment and submitting this assessment to the FAA for approval.  (Id.)  In fact, there is no evidence that the Board has continued to pursue, or even formally discussed, the runway extension since 2008.[25]

Plaintiffs have thus failed to show that the JAA would be "likely" to complete the runway project in the absence of the Comp Plan restriction.  KH Outdoor, 482 F.3d at 1303.  Through its corporate representative, the JAA itself has stated that it is "not sure" if the Board still desires to extend the runway and that "there hasn't been any concrete direction" from the Board on this issue.  (Doc. 55-2 at 55.)  This testimony is corroborated by the Board's failure to take any significant  action—or even formally discuss the issue—since the JAA's withdrawal of the amendment to the Comp Plan.  Thus, whether the JAA would seek to extend the runway if the Comp Plan restriction were removed is "speculative" or "conjectural."  KH Outdoor, 482 F.3d at 1303.

Plaintiffs say that the Court should not require the JAA to do a "futile" act by asking the City Council to remove the Comp Plan restriction because the City Council is the body that imposed the restriction on runway length in the first place.  However, in January 2008,

---

[25] The most recent action taken by the Board was on July 28, 2008, when it authorized the JAA to spend $200,000 for a feasibility study required by the FAA. (Doc. 55-2 at 28, 35-36.)  It is not clear, however, how much of this money was actually spent, or whether any portion of the feasibility study was actually completed.

the City Council passed a resolution to approve the runway extension (with other conditions), and, indeed, at the JAA's behest, the City Council was scheduled to further discuss the extension in April 2008. Before it could do so, however, the JAA decided to withdraw its request, a request it has yet to renew. Given this scenario, it remains "conjectural" whether, even if this Court were to invalidate the Comp Plan restriction, the JAA would move forward.[26]

Plaintiffs' standing ultimately depends in large measure on the likelihood of JAA action. At this point, it is too uncertain whether the JAA would act. Thus, because plaintiffs have failed to establish that the Comp Plan restriction has caused them an injury that would be likely to be redressed by a favorable judgment, they lack standing to bring this suit.[27]

---

[26] If the JAA had formally renewed its request to the City Council to amend the Comp Plan, and the City Council had rejected this request, the standing analysis might be different. However, because the JAA has a viable pathway open to lift the Comp Plan restriction by requesting the City Council to remove it and has chosen not to do so, it is difficult to predict how the JAA would react if the Comp Plan restriction were removed by Order of this Court.

[27] In their second supplemental brief and at the July 16, 2012 hearing, plaintiffs argued for the first time that, even if it were unlikely that the JAA would extend the runway if the Comp Plan restriction were removed, plaintiffs nevertheless have standing because the Comp Plan restriction stands as an "impediment to plaintiffs' goals." (Doc. 55 at 7.) Plaintiffs rely exclusively on the Supreme Court's decision in Metropolitan Washington Airports Authority v. Citizens for the Abatement of Aircraft Noise, Inc., 501 U.S. 252 (1991), in support of their argument. After reviewing this case, the Court finds that it is distinguishable. Courts have found that the passage from Metropolitan relied on by plaintiffs identifies a "procedural injury." See Nat'l Treasury Employees Union v. United States, 101 F.3d 1423, (D.C. Cir. 1996). The Eleventh Circuit has subsequently held that "[t]o show a cognizable injury in fact in a procedural injury case, a plaintiff must allege that the agency violated certain procedural rules, that these rules protect a plaintiff's concrete interests and that it is reasonably probable that the challenged action will threaten these concrete interests." Ouachita Watch League v. Jacobs, 463 F.3d 1163, 1170 (11th Cir. 2006). Unlike the plaintiffs in Metropolitan, who had been denied the ability to petition and influence the actions of their local government, plaintiffs have identified no such violation of a procedural

B.    Ripeness

"In deciding whether a claim is ripe for adjudication or review, [courts] look primarily at two considerations: 1) the fitness of the issues for judicial decision, and 2) the hardship to the parties of withholding court consideration."  Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1224 (11th Cir. 2004).   "The ripeness doctrine protects federal courts from engaging in speculation or wasting their resources through the review of potential or abstract disputes."  Digital Properties, Inc. v. City of Plantation, 121 F.3d 586, 589 (11th Cir. 1997).

As the Eleventh Circuit has explained, standing and ripeness analysis can involve "doctrinal overlap."  Elend, 471 F.3d at 1205.  In particular, when a plaintiff's injury is contingent on future events, "standing and ripeness inquiries may tend to converge."  Id. Just as a plaintiff must demonstrate injury-in-fact to establish standing, "[a] claim is not ripe when it is based on speculative possibilities."  In re Jacks, 642 F.3d 1323, 1332 (11th Cir. 2011);  see also Ala. Power, 307 F.3d at 1310 n.9 ("[T]he ripeness doctrine seeks to separate matters that are premature for review because the injury is speculative and never may occur, from those cases that are appropriate for federal court action.") (quoting Erwin Chemerinsky, *Federal Jurisdiction* § 2.4.1 (3d ed.1999)).

---

right designed to protect their interests.  Moreover, even if such a procedural right was implicated, for the reasons stated above, plaintiffs would nevertheless lack standing because "[t]he chain of causation between the alleged procedural violation and the concrete interest is speculative at best."   Cntr. for Law and Educ. v. Dept. Of Educ., 396 F.3d 1152, 1159 (D.C. Cir. 2005); see also Summers v. Earth Island Institute, 555 U.S. 488, 496 (2009); Renal Physicians Assoc. v. U.S. Dept. Of Health and Human Servs., 489 F.3d 1267, 1279 (D.C. Cir. 2007); Nat'l Treasury Employees Union, 101 F.3d at 1429.

Here, whether plaintiffs are injured by the Comp Plan restriction depends on whether the JAA would extend the runway in its absence.  For the reasons previously stated, however, how the JAA would act if the Comp Plan restriction were removed is too uncertain; thus, this case is not ripe for adjudication.[28]

In sum, "[w]hether viewed as a problem of standing or ripeness, the result in this case is that, at this point, the speculative possibility that the [JAA would extend the runway] is too uncertain to present a constitutional 'case or controversy.'" Bowen v. First Family Fin. Servs., Inc., 233 F.3d 1331, 1341 n.7 (11th Cir. 2000).  Plaintiffs hypothesize that, if only this Court would lead the way, the JAA will be prompted to take action and extend the runway. However, this is not the Court's proper role; this Court has jurisdiction only to decide real controversies between parties with "concrete interests."  At this point, and on this record, plaintiffs' interests are too "conjectural" and any decision regarding the merits of plaintiffs' preemption claims would constitute an impermissible advisory opinion.

Accordingly, it is hereby

**ORDERED**:

1.  Plaintiffs Craig Air Center, Inc. and Sky Harbor Corporation's Motion for Summary

---

[28] To the extent plaintiffs argue that the ripeness analysis from Metropolitan is applicable to this case, the Court is unpersuaded.  In Metropolitan, the Supreme Court held that the plaintiffs' claims were ripe because "[t]he threat of the veto hangs over the Board of Directors like the sword over Damocles, creating a here-and-now subservience to the Board of Review sufficient to raise constitutional questions." Metropolitan, 501 U.S. at 265, n.13.  In other words, the Supreme Court found that the Board of Review's veto power influenced the actions of the Board of Directors.  By contrast, here, the JAA is free to renew its request of the City Council to remove the Comp Plan restriction and take other steps to move toward implementation of the runway extension; it has just chosen not to do so.

Judgment (Doc. 30) is **DENIED**.

      2.  Defendant, City of Jacksonville's Cross Motion for Summary Judgment (Doc. 36) is **GRANTED** to the extent that this case is **DISMISSED** for lack of jurisdiction.

      3.  The Clerk is directed to close the file.

      **DONE AND ORDERED** at Jacksonville, Florida this 1st day of August, 2012.

 

                                                           _____
                                                           TIMOTHY J. CORRIGAN
                                                           United States District Judge

js.
Copies:

counsel of record